Matthew D. Powers (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
William P. Nelson (Bar No. 196091)
william.nelson@tensegritylawgroup.com
Gina Cremona (Bar No. 305392)
gina.cremona@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:   (650) 802-6000
Facsimile:    (650) 802-6001

Azra Hadzimehmedovic (Bar No. 239088)
azra@tensegritylawgroup.com
Aaron M. Nathan (Bar No. 251316)
aaron.nathan@tensegritylawgroup.com
Samantha A. Jameson (Bar No. 296411)
samantha.jameson@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260,
McLean, VA 22102
Telephone:   (703) 940-5031
Facsimile:    (650) 802-6001

*Attorneys for Plaintiff* AXONICS, INC.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| AXONICS, INC.,<br><br>        Plaintiff,<br><br>  v.<br><br>MEDTRONIC, INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; MEDTRONIC LOGISTICS, LLC; MEDTRONIC USA, INC.<br><br>        Defendants. | Case No.  8:22-cv-309<br><br>**COMPLAINT FOR ANTITRUST, LANHAM ACT, AND CALIFORNIA BUSINESS AND PROFESSIONS CODE VIOLATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

Axonics, Inc. ("Axonics") brings claims against Medtronic, Inc., Medtronic Puerto Rico Operations Co. ("MPROC"), Medtronic Logistics, LLC ("Medtronic Logistics"), and Medtronic USA, Inc. ("MDT USA") (individually and collectively "Medtronic") for making false and misleading representations in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and false advertising under California Business and Professions Code §§ 17500 et seq. Axonics also brings claims against Medtronic for Medtronic's anticompetitive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and § 17200 et seq. of the California Business and Professions Code. This Court has jurisdiction under the preceding statutes and at least 28 U.S.C. §§ 1331, 1337, 1338, and 1367, and 15 U.S.C. §§ 1116.

## THE PARTIES

1.     Axonics is a Delaware corporation having its principal place of business located at 26 Technology Dr., Irvine, CA 92618.

2.     Medtronic, Inc. is a Minnesota corporation having its principal place of business located at 710 Medtronic Parkway, Minneapolis, MN 55432.

3.     MPROC is a Cayman Islands corporation, having its principal place of business located at Ceiba Norte Industrial Park, 50 Road 31, Km. 24.4, Juncos, Puerto Rico 00777-3869.

4.     Medtronic Logistics is a Minnesota corporation having its principal place of business located at 710 Medtronic Parkway, Minneapolis, MN 55432.

5.     MDT USA is a Minnesota corporation having its principal place of business located at 710 Medtronic Parkway, Minneapolis, MN 55432.

## JURISDICTION AND VENUE

6.     Axonics incorporates the foregoing paragraphs by reference as if fully set forth herein.

7.     The Court has subject matter jurisdiction over Axonics' claims under 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. §§ 1116 and 1125 related to Medtronic's false and misleading representations.

1

8.      The Court has subject matter jurisdiction over Axonics' Antitrust Claims under the antitrust laws including Title 15 of the United States Code (including 15 U.S.C. § 2), as well as 28 U.S.C. §§ 1331, 1337, and 1367.

9.      The Court has personal jurisdiction over Medtronic at least by virtue of Medtronic's filing of a Complaint against Axonics in this Court in Case No. 8:19-cv-02115-DOC-JDE. Medtronic has submitted to the jurisdiction of the Court. Medtronic has committed acts and/or omissions related to these claims in this District including as related to Medtronic's co-pending lawsuit in this district, Case No. 8:19-cv-02115-DOC-JDE.

10.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Medtronic meets the requirements for venue under the foregoing statutes, including because on information and belief Medtronic transacts business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. For example, Medtronic's website lists multiple physicians in this District as performing Medtronic Bladder Control Therapy, confirming that Medtronic transacts business in this district and communicates with doctors in this District. Ex. 1, https://www.medtronic.com/us-en/patients/treatments-therapies/bladder-control/considering/find-specialist.html; Ex. 2, https://www.medtronic.com/physicianlocator/googleMaps/showResults?units=miles&searchBy=city&searchTerm=Santa+Ana%2C+ca&insuranceName=&searchRadius=25miles&therapySite=www.medtronic.com&physicianIdList=%5B110890%2C+111006%2C+2165%2C+3581%2C+192%2C+3697%2C+2761%2C+3676%2C+1382%5D&plSearchTherapyType=NA&plSearchUserRole=NA&physician=NA&facility=NA&physicianId=NA&physicianName=NA&locationId=NA&locationName=NA&message=refined_search_click_DCR&callDTM=true&refined=true&therapy=1&findFilter=physician&searchByFilterName=cityAndState&searchByFilterValue=Santa+Ana%2C+ca&zipOrCityRadius=25&search-button=SEARCH.

Medtronic also lists regional locations in Irvine, California; Santa Ana, California; Goleta, California; and Northridge, California. Ex. 3, https://www.medtronic.com/us-en/our-company/locations.html. Medtronic has a neuromodulation executive team at 5290 California Ave, Irvine, California 92617. *Id.* Medtronic, Inc., Medtronic USA, and Medtronic Logistics are also listed as active entities of record with the California Secretary of State (https://businesssearch.sos.ca.gov).

11.    Moreover, Medtronic proposed during the February 17, 2022, hearing in Case No. 8:19-cv-02115-DOC-JDE, which involves the same parties appearing before Judge David Carter in this district, that Axonics should file a separate complaint with the claims asserted herein, and Medtronic would be willing to work cooperatively to make discovery efficient and reduce the burden between the two cases. Medtronic proposed that the parties could address factual issues that overlap, including by coordinating witnesses between the cases. This case proceeding in this district will permit the coordination that Medtronic proposed and further confirms that venue and jurisdiction is proper.

## MEDTRONIC'S FALSE AND MISLEADING STATEMENTS REGARDING THE AXONICS SACRAL NEUROMODULATION SYSTEM

12.    As of 2019, prior to Axonics' entry, Medtronic had a monopoly—100% market share—in the sacral neuromodulation system ("SNM") product market.

13.    During the time of Medtronic's SNM product market monopoly, the progress of technology in the market was stagnant. Medtronic received steady recurring revenue for its SNM products without needing to improve them because Medtronic's SNM products needed to be surgically removed by design whenever a patient with an implant needed to get a full body MRI scan and whenever the non-rechargeable internal battery ran out of power. At best, even if a patient never needed a full-body MRI, anyone with a Medtronic SNM implant would need to

have surgery to remove the implant and replace it with a new implant approximately every 4.4 years on average.

14. This state of affairs was a function of Medtronic's monopoly power in the SNM market: Medtronic actually had the resources and technology to make its SNM implant more compatible with MRI technology so that patients were less likely to need to have the implant surgically removed to get an MRI and then surgically reimplanted after the MRI was complete. But, facing no SNM competition and apparently seeing no reason to include that surgery-avoiding technology, Medtronic kept that technology out of its SNM products, despite consumer demand.

15. Medtronic's Intellis™ spinal cord neurostimulation device, released in 2017, contained both rechargeable battery technology and full body MRI compatibility under certain conditions.  Once again lacking competitive motivation to include that surgery-avoiding technology, Medtronic did not include it in its SNM products.

16. Instead of selling a product that would last longer and be more MRI compatible, Medtronic sold products that, by design, required repeated surgical intervention and replacement. On information and belief, Medtronic's suppression of expanded MRI-compatibility and recharge capability in the SNM market increased the number of SNM products Medtronic would be likely to sell to a given incontinence patient over the course of that patient's treatment.

17. When Axonics entered the market with its own SNM technology, its products were both rechargeable and had expanded MRI compatibility, thus promising to dramatically improve the lives of consumers suffering from incontinence in the SNM market and at the same time threatening Medtronic's longstanding monopoly.

18.     In response to this new competitive threat, Medtronic actively explored buying Axonics outright. In 2016, high-level Medtronic executives met with Axonics executives and stated their desire for Medtronic to acquire Axonics.

19.     Later, Jeff Erb of Medtronic reported to Ray Cohen of Axonics that Medtronic had been given legal advice by its attorneys that for Medtronic to purchase Axonics would be in potential violation of the antitrust laws. At the time in question, around 2016, if Medtronic had acquired Axonics this would have eliminated a nascent competitor and protected Medtronic's longstanding monopoly in the SNM market. Jeff Erb, Medtronic's Senior Director of Business Development, informed Axonics' CEO Ray Cohen that based on the legal advice of its antitrust counsel, Medtronic no longer would pursue an acquisition of Axonics.

20.     Having first told Axonics that antitrust law prevented Medtronic from acquiring Axonics, Medtronic then orchestrated a course of conduct aimed at achieving by other, illegal means the exclusion of Axonics from the market where Medtronic held a monopoly.

21.     Axonics launched its product with a 15-year life in the body in late 2019. Medtronic orchestrated a pattern of false statements attempting to attribute to Axonics' products the very shortcoming of Medtronic's products that enabled Axonics to threaten Medtronic's longstanding monopoly: the need for explant surgery.

22.     Medtronic engaged in a campaign of false and misleading statements designed to undermine consumer confidence in the Axonics products and specifically to propagate the false belief that Axonics' products suffered from problems that would likely cause them to need to be explanted before they reached the end of their 15-year-life.

**A.      Medtronic's First Quarter 2020 Earnings Call**

23.     On August 25, 2020, Medtronic Chief Executive Officer Geoff Martha stated on Medtronic's Q1 2020 earnings call that "we're seeing cases where our competitor's device is being explanted and replaced by [Medtronic InterStim] Micro." https://filecache.investorroom.com/mr5ir_medtronic/126/Medtronic%20Commentary-FY21Q1-FINAL.pdf at 2. When Medtronic was asked by a third-party analyst at Wells Fargo about this statement, Medtronic stated that it was aware of five explants over a specific three-week period and that one reason for the explants was that the recharge experience with Axonics is not as good as the recharge experience with Medtronic InterStim Micro. On information and belief, these statements and communications are false and/or misleading; they were specifically tailored to try to persuade consumers, including doctors and patients, that use of Axonics' product would result in otherwise avoidable explant surgery. When this statement was made, Medtronic's new rechargeable product had been on the market for only three weeks. Axonics is not aware of any explantations of the Axonics System meeting these descriptions in this time frame.

24.     Medtronic's false and/or misleading statements regarding explantation have a tendency to deceive, mislead, and confuse, and have deceived, misled, and confused, a substantial portion of the intended audience for these statements. For example, Mr. Martha's false and misleading statements led members of the analyst community to inquire as to whether and why these explants had occurred.

**B.      Medtronic's Institutional Investor And Analyst Day Presentation**

25.     On October 14, 2020, at Medtronic's Institutional Investor & Analyst Day on October 14, 2020, Medtronic employee Brooke Story, the President of Medtronic's Pelvic Health business, told attendees that the "Axonics battery will function like today's cell phone batteries and lose the ability to hold a charge over time. In addition, when discharged to 0, the Axonics system has a battery death

risk that Medtronic addressed with our Overdrive technology." The slides shown by Brooke Story (images below) were labeled as relating to the "InterStim Micro System," and said that Axonics' "[c]apacity fades over time." The slides also stated that, for Axonics, there was a "[r]isk of permanent damage if fully discharged" and that Axonics would be "[u]nable to recharge."



26.     These statements are false and misleading: The Axonics System contains hardware and software protections that prevent the battery from being overdischarged and impacting performance; it does not meaningfully lose the ability to hold a charge over time, nor is there a "battery death risk." On information and belief, these statements were made for the purpose of deceiving consumers into believing that use of the Axonics products would result in otherwise avoidable explant surgery.

27.     A Medtronic sales representative wrote to a physician on September 28, 2021, "So the question for your AXNX rep is 'if a patient runs their battery to the point it can no longer deliver stimulation and it goes into hibernate, how much longer can that patient's device last before it reaches Zero Volts/Overdischarge?' . . . the implications are serious for your patients."  The Medtronic representative also made the following statements. "Traditional lithium ion batteries have limitations and it's one of the reason [sic] why rechargeable systems are explanted at twice the rate of recharge-free systems," misleadingly suggesting that the Axonics System would need to be explanted at a high rate due to purported battery issues. "The fact is that if the Axonics battery goes to zero volts it will have significant and noticeable damage. . . . If patients could choose knowing that they could damage their battery if they leave it uncharged for long periods of time (e.g., weeks) or one that was not affected by the same scenario, what would they choose?" These statements are false and misleading and on information and belief were made for the purpose of convincing consumers that using the Axonics product would result in otherwise avoidable explant surgery.

### C.     Medtronic's "Not All Batteries Are Created Equal" Document

28.     On information and belief, by September 2021, Medtronic had created and widely distributed a document, entitled "Not All Batteries Are Created Equal" (the "Medtronic Battery Document") (attached as Exhibit 4) that compares Medtronic's battery technology with Axonics' battery technology and contains

several false, misleading, and deceptive statements, which further the purpose of deceiving consumers into believing that using the Axonics product would result in otherwise avoidable explant surgery.

29.    Medtronic arranged to have copies of the Medtronic Battery Document sent to all attendees of the conference of the American Urogynecologic Society ("AUGS") in Phoenix, AZ from October 13-15, 2021 (the "AUGS Conference"). Medtronic confirmed that it sent this material to all attendees in a co-pending case in this district. *See* Case No. 8:19-cv-02115-DOC-JDE, Dkt. No. 88 at 19. The recipients of the document at the AUGS Conference included numerous actual and potential Axonics customers, including many key opinion leader surgeons who can be influential in driving customer choice. In addition, on information and belief, Medtronic representatives have distributed the document (or a similar document) to numerous actual and potential Axonics customers.

30.    As shown in the excerpt below, the Medtronic Battery Document states that "HEAD-TO-HEAD BATTERY TESTING PROVES MEDTRONIC OUTPERFORMS AXONICS," while depicting the Axonics batteries as part of the Axonics System. This statement is false and misleading, because Medtronic had the batteries removed from the Axonics System and conducted the testing on standalone batteries.  As such, Medtronic's testing did not account for device level features and protections implemented by Axonics that prevent battery overdischarge.  Medtronic's testing data has no relevance to doctors and patients as to the actual performance of the Axonics System battery when it is implanted and used as part of the Axonics System. Moreover, that same document confirms that Medtronic knows that the Axonics System contains such hardware and software protections that prevent the battery from overdischarging and impacting performance, and thus knows that its statements are false. The Medtronic document stated: "This brochure only covers aspects related to the batteries of the InterStim™ Micro and Axonics® neurostimulators. Other aspects or components

of the neurostimulators that affect device performance or overdischarge are not covered in this brochure, ***including software features to slow overdischarge that are associated with the Axonics® device***." (emphasis added). First, considering battery performance apart from protections in the product itself is false and misleading, including because Medtronic is incorrectly saying that there is some relevance in considering battery performance apart from device protections. Medtronic is creating baseless concerns regarding the protections in place in the devices. Second, Medtronic's statements regarding ***the products*** themselves are false and misleading, including because Medtronic is stating the batteries ***in products*** pose the risks falsely and misleadingly described.



31.     The Medtronic Battery Document further states, under a picture of the entire Axonics implant, "SIGNIFICANT BATTERY PERFORMANCE DAMAGE IF OVERDISCHARGED."  Similarly, the Medtronic Battery

Document states that "Axonics® lithium-ion battery cells have significant performance damage if overdischarged." These statements are false and misleading. The Axonics device contains hardware and software protections that prevent the battery from being overdischarged and impacting performance. Medtronic's testing was performed on batteries that were removed from the devices, meaning that the testing did not account for device level features and protections such as Axonics overdischarge protection. But Medtronic nevertheless told customers and potential customers that there were concerns about Axonics' products—which means that Medtronic was stating that notwithstanding the device level features there was still cause for concern. That is false and misleading.

32.     In the Medtronic Battery Document, Medtronic relies on the irrelevant testing data to suggest that patients should worry about overdischarge with the Axonics device. Medtronic states that "The negative impact from overdischarge is permanent and not reversible for the Axonics® battery. This creates an *increased recharge burden for patients*," and "*No patient should worry about damage caused by overdischarge.*" Ex. 4 (Medtronic Battery Document at 2) (emphasis added). These statements are false and misleading, particularly when read in conjunction with statements in the Medtronic Battery Document suggesting that the testing results apply directly to the Axonics System as implanted – i.e., in the presence of the hardware and software protections put in place by Axonics, - such as "[o]ver the *device lifetime*, there are many scenarios that may lead to devices not being recharged," including "*forgetting to recharge the battery*." Ex. 4 (Medtronic Battery Document at 2) (emphasis altered from original).

D.     **Medtronic's AUGS Symposium Presentation**

33.     Medtronic representatives have repeatedly and consistently made similar false and misleading statements to customers and potential customers about the performance of the Axonics System rechargeable battery. For example, at the

11

same AUGS Conference where Medtronic distributed hundreds of copies of the false and misleading Medtronic Battery Document, Medtronic employees and paid third-party consultant(s) repeated and expanded upon the same false and misleading information.

34.     During the Medtronic breakfast symposium at the AUGS Conference, Medtronic presented false and misleading information about the Axonics battery to numerous actual and potential Axonics customers. Dr. Kevin Benson, a third-party Medtronic-paid physician consultant, started the discussion on the Axonics battery by stating "[The battery testing data] really is enlightening and I think that for me, it really opened my eyes to the differences in batteries."

35.     During the symposium, Marisa Caldwell, Ph.D., a Medtronic employee and battery scientist, presented testing data generated by a Medtronic vendor purporting to show that the Medtronic battery is superior to the Axonics battery. Medtronic performed this testing on Axonics batteries as a "subcomponent," in isolation from the overall Axonics System, so the overdischarge protection features of the Axonics System could not prevent overdischarge in that disconnected battery.  Medtronic's hired testers then forced the battery to overdischarge repeatedly – something that would never happen in a clinical setting because in a clinical setting the Axonics mechanisms that prevent overdischarge could not and would not be bypassed.

36.     Presenting the data from this completely fabricated scenario that purportedly showed damage to the Axonics battery's ability to recharge, Ms. Caldwell's presentation stated that "Axonics Li-ion cells completely fail within a cumulative ~1mo at 0V (zero volts)," suggesting that a patient who did not recharge their Axonics System for a cumulative period amounting to a single month, could experience irreversible damage to the battery such that it would no longer charge.  Ms. Caldwell stated that "what concerns me as a scientist and an engineer" is that "people should not have to worry, 'oh am I going to ***damage my***

*sacral neuromodulator* because I'm not recharging' . . . . A patient should not have to worry about a device because they are dealing and coping with life." These statements by Ms. Caldwell are false and misleading.  The Axonics System contains hardware and software protections that prevent the battery from being overdischarged and impacting performance, so the artificial test conditions that purportedly created a battery issue could not occur with an implanted Axonics System, but Medtronic nevertheless is stating that there is such a concern in the Axonics products. In short, no patient needs to worry about the battery in an Axonics product, but Medtronic is falsely and misleadingly saying they should.

37.     Following Ms. Caldwell's presentation, speaking at Medtronic's behest, third-party Dr. Kevin Benson continued to rely on the battery testing data to raise concerns about using the Axonics device on patients.  He told physicians in attendance:

> This is probably the most impactful, "a-ha" moment for me when I think about the type of device I want to use. . . .   The idea that you would have an independent lab prove this out, for me was really eye opening.  Because, if you think about 15 years with the device, the probability they're going to have a month or more of cumulative time with the device off . . . it's almost a guaranteed fact. … It is perhaps a determinant in what you choose. … ***So the idea that cumulatively at one month of time off for the device that it's had irreversible damage and it has lost its efficacy, is a big deal.***  My concern about placing a device for anybody, if it's going to be a 15-year device, those situations are going to come up more regularly than I think any of us can anticipate.  So to me, it really gives me piece of mind to know that I don't have to ***worry about what scenario is gonna play out, but . . . the patient is still going to be protected and have a functioning dev*ice.**

38.     While Dr. Benson made this statement, Medtronic showed a slide with the tagline "No patient should have to worry about damage due to overdischarge" and kept the slide on the screen for several minutes.  That slide is shown below.

13



39.    These statements are false and misleading. The Axonics System contains hardware and software protections that prevent the battery from being overdischarged and impacting performance, and the testing performed by Medtronic under artificial test conditions created results which could not occur with an implanted Axonics System.  Medtronic's statements that there was nevertheless a concern with overdischarge in Axonics devices were false and misleading. Moreover, Medtronic's statement that a patient's failure to recharge the Axonics System battery for a month, either all at one time, or cumulatively, would cause "irreversible damage" to the battery, is false.

40.    Medtronic knows that these statements are false and misleading, because Medtronic knows that the Axonics System contains hardware and software protections that prevent the battery from being overdischarged and impacting performance.  The "fine print" in the Medtronic Battery Document entitled "All Batteries Are Created Equal" and the Medtronic breakfast symposium slide deck states that "[t]his information only covers aspects of the batteries of the InterStim Micro and Axonics neurostimulators.  Other aspects or components of the neurostimulation that affect device performance or overdischarge are not covered by this information, including software features to slow overdischarge that are

associated with the Axonics device." Similarly, the Medtronic Battery Document states that the "testing was designed to examine true battery behavior, ***beyond*** device level features. . . ." First, considering battery performance apart from protections in the product itself is false and misleading, including because Medtronic is incorrectly saying that there is some relevance in considering battery performance apart from device protections. Medtronic is creating baseless concerns regarding the protections in place in the devices. Second, Medtronic's statements regarding ***the products*** themselves are false and misleading, including because Medtronic is stating the batteries ***in products*** pose the risks described when they do not.

41. Medtronic's false and misleading statements about the Axonics System battery have a tendency to deceive, mislead, and confuse, and have deceived, misled, and confused, a substantial portion of the intended audience for these statements. For example, following Medtronic's distribution of the Medtronic Battery Document and presentation at the AUGS conference, multiple physicians came to the Axonics booth at the conference to inquire whether the Axonics System battery was at risk of overdischarge. Similarly, a physician in attendance at Medtronic's presentation at the AUGS conference asked Medtronic's Ms. Caldwell whether doctors need to worry about patients needing an explant if they do not charge their implant.

42. Medtronic sales representatives have privately made the same false and misleading statements to doctors. For example, one email from a Medtronic sales representative to a physician in October 2021, apparently referring to the "Not All Batteries Are Created Equal" materials, falsely stated "[i]ndependent, head to head data shows the Medtronic InterStim Micro, with Overdrive Technology, shows superior performance vs. Axonics" and that "Medtronic Outperforms Axonics. Period." As described above, the "Not All Batteries Are Created Equal" materials themselves show that such statements about the

performance of ***Medtronic's and Axonics' devices*** are false: "This brochure ***only covers aspects related to the batteries*** of the InterStim™ Micro and Axonics® neurostimulators. ***Other aspects*** or components of the neurostimulators that affect device performance or overdischarge ***are not covered*** in this brochure, ***including software features to slow overdischarge that are associated with the Axonics® device***." (Emphasis added.) The October 2021 email goes on to falsely state that patient use of the Axonics device would result in harmful overdischarge, again apparently relying on the "Not All Batteries Are Created Equal" materials: "Overdischarge – if a regularly scheduled charging cycle(s) are missed and the battery is left at 0 volts, after only 1 month, the Axonics battery will completely fail (see page #2, right diagram)." The email continued to make false statements about the Axonics ***device***: "In short, the InterStim Micro cannot be compated [sic, compared] to the ***Axonics device***."

43.    As another example, a different Medtronic sales representative wrote to a physician in September 2021, "So the question for your AXNX rep is 'if a patient runs their battery to the point it can no longer deliver stimulation and it goes into hibernate, how much longer can that patient's device last before it reaches Zero Volts/Overdischarge?' . . . the implications are serious for your patients." The Medtronic representative went on to state, "Traditional lithium ion batteries have limitations and it's one of the reasons why rechargeable systems are explanted at twice the rate of recharge-free systems." Medtronic misleadingly suggests that the Axonics System would need to be explanted at a high rate due to purported battery issues.  "The fact is that if the Axonics battery goes to zero volts it will have significant and noticeable damage. . . . If patients could choose knowing that they could damage their battery if they leave it uncharged for long periods of time (e.g., weeks) or one that was not affected by the same scenario, what would they choose?" These statements are false and misleading for the reasons described above.

44.     On information and belief, Medtronic has also falsely stated that Axonics devices have actually been explanted due to battery overdischarge.

**E.     Medtronic's Campaign Of False And Misleading Statements**

45.     On information and belief, the foregoing false statements were made for the specific purpose of deceiving consumers into the false belief that using Axonics products would result in otherwise avoidable explant surgeries due to irreversible battery failure.

46.     Each of the foregoing false and misleading statements was made by Medtronic as a commercial advertisement in the course of its competition with Axonics in the SNM market, for the purposes of influencing physicians and other customers to purchase its InterStim SNM products rather than the Axonics system, and each of the foregoing false and misleading statements was disseminated broadly to the purchasing public.

47.     Medtronic's false and misleading statements at the AUGS Conference in October 2021, and in the Medtronic Battery Document, were commercial advertisements in the course of its competition with Axonics in the SNM market, for the purposes of influencing physicians and other customers to purchase its InterStim SNM products rather than the Axonics system, and each of the foregoing false and misleading statements was disseminated broadly to the purchasing public. The audience for these false and misleading statements was physicians who make purchasing decisions between Medtronic and Axonics products, and the false and misleading statements were made or distributed to large numbers of these physicians.

48.     Medtronic's false and misleading statements at Medtronic's Institutional Investor & Analyst Day on October 14, 2020, and those made at earnings calls and to market analysts, were commercial advertisements in the course of its competition with Axonics in the SNM market, for the purposes of influencing physicians and other customers to purchase its InterStim SNM

products rather than the Axonics system.  The audience for these false and misleading statements was physicians and other members of the public who make purchase decisions between Medtronic and Axonics products, and who would be interested in, and have access to, public statements about the respective qualities of these products made either directly by Medtronic or by third parties at the inducement of Medtronic. The false and misleading statements were made widely available to the public, including in the transcripts of earnings calls and in analyst statements – which, on information and belief, included large numbers of physicians.

49.     Medtronic's false and misleading statements made directly to physicians in emails and other direct communications were commercial advertisements in the course of its competition with Axonics in the SNM market, for the purposes of influencing physicians and other customers to purchase its InterStim SNM products rather than the Axonics system. Each of these false and misleading statements was disseminated broadly to the purchasing public, given the limited number of purchasers in the market.  In any event, on information and belief, Medtronic representatives made these direct communications to large numbers of individual purchasers, thereby disseminating them broadly.  The audience for these false and misleading statements was physicians and other members of the public who make purchasing decisions between Medtronic and Axonics products.

50.     On information and belief, Medtronic deliberately and systematically disseminated this false information for the purpose of striking fear into doctors and patients alike and specifically wielding the threat of physical bodily harm being inflicted upon incontinence patients who chose an Axonics implant. Medtronic propagated a pattern of false and misleading statements designed to convince doctors and consumers that the result of using the Axonics products would be undesired explant surgery that could be avoided by using a Medtronic implant

instead. Medtronic's illegal and anticompetitive campaign to disseminate false information regarding Axonics' products in order to frighten Axonics' actual and potential customers is part of an overall scheme and course of conduct aimed at excluding Axonics from the SNM market.

51.    Medtronic did not limit itself to having its own personnel make these statements, but further, on information and belief, caused and attempted to cause third parties capable of projecting the appearance of neutral objectivity to make the above false statements.

52.    For example, as described above, Dr. Benson spoke during the Medtronic AUGS presentation to create the false concern about irreversible overdischarge damage when Axonics' devices are implanted in patients.

53.    For another example, on information and belief, Medtronic's communications with Wells Fargo, as described above, were made for the purpose of inducing Wells Fargo, a third party, to make statements that were false but that bore the indicia of neutral objectivity, with the intent of amplifying Medtronic's exclusionary and anticompetitive impact.  Medtronic's efforts to induce third parties to repeat false and misleading information also constitutes a part of Medtronic's overall scheme and course of conduct aimed at excluding Axonics from the SNM market.

54.    Medtronic's pattern of false and misleading statements concerning Axonics' products and specifically the likelihood that they would need to be explanted constitutes exclusionary conduct.

55.    As explained herein, Medtronic's statements were clearly false. On information and belief, no patients have needed to have Axonics products explanted and replaced with Medtronic products due to dissatisfaction with the recharge process. Axonics' products are specifically designed so that overdischarge does not present a threat or risk of battery failure or explantation. As

explained herein, Medtronic's statements alleged herein were specifically designed to create false beliefs in the minds of those who heard or read them.

56.     Medtronic's campaign of false and misleading information is clearly material as it presents as if it were true a risk that Axonics customers will need to undergo undesired explant surgery as a result of choosing to be implanted with an Axonics product. Medtronic's false statements are clearly material because they spread false beliefs about Axonics' products that any reasonable person would consider important in deciding which SNM product to choose in a way that can materially injure Axonics' ability to provide its SNM products.

57.     Medtronic's statements are clearly likely to induce reasonable reliance. As a supplier of medical devices, many doctors and patients alike rely on Medtronic to be truthful in its descriptions of medical devices and the risks and benefits that they present. Many doctors and patients would not readily expect that a company that doctors and patients must be able to trust would invent outright falsehoods about the subject matter of their products and competing human implants designed to treat a chronic condition. Moreover, Medtronic's statements are especially likely to induce reasonable reliance when the statements are made by third parties with the appearance of neutral objectivity as described above.

58.     On information and belief, Medtronic's statements were made to buyers without knowledge of the subject matter: specifically, Medtronic's statements were made to investors and analysts, doctors, and the public at large. Medtronic's statements contained information, such as a specific number of explants and the reasons for such alleged explants, that very few people would have the ready wherewithal to test. Investors, analysts, and patients frequently lack the background and information to reliably assess the truth or falsity of seemingly technically based false statements about SNM devices. Moreover, on information and belief, physicians, even physicians familiar with SNM products, frequently lack the specific scientific expertise—e.g., in battery technology, wireless

charging, or software, to name a few, and scientific research methods related to risk assessment—and also lack the factual information necessary to reliably assess the truth or falsity of Medtronic's false and misleading statements.  Indeed, physicians rely on Medtronic and other medical device companies to provide truthful and accurate information about the risks of using medical devices because the medical device companies themselves are in a unique position with access to extensive factual information and resources for assessing that information that neither physicians nor patients have the ability to access or assess. The types of statements Medtronic made as part of its campaign of deception are exactly the kinds of statements going to exactly the kind of subject matter where the physicians, patients, and others who heard them lack sufficient knowledge to not be deceived or misled.

59.    Medtronic's campaign of statements made by Medtronic and by third parties with the appearance of neutral objectivity, which were meant to disseminate the false information that Axonics products were likely to be explanted or were in fact being explanted, when they were not, for reasons that were false, misleading, and aimed at the heart of Axonics' products, continued for prolonged periods of time. On information and belief, Medtronic began disseminating false information about Axonics' products at least as early as August 25, 2020, and has continued to do so through at least October 2021 and later. On information and belief Medtronic's campaign of false and misleading statements has not ceased as of the filing of this Complaint.

60.    To the extent that any of Medtronic's false and misleading statements are found not to be literally false, each is nonetheless highly misleading, and has a tendency to deceive, mislead, and confuse, and has deceived, misled, and confused, a substantial portion of the intended audience for these statements.  For example, following Medtronic's distribution of the Medtronic Battery Document and presentation at the AUGS conference, multiple physicians came to the Axonics

booth at the conference to inquire whether the Axonics System battery was at risk of overdischarge.  Similarly, a physician in attendance at Medtronic's presentation at the AUGS conference asked Medtronic's Ms. Caldwell whether doctors need to worry about patients needing an explant if they do not charge their implant.

61.     Medtronic's false and misleading statements are not readily susceptible of neutralization or other offset by Axonics. On information and belief, for any given false statement Medtronic makes about Axonics, it is more likely that the statement will not get back to Axonics than that it will. The fact that certain of Medtronic's falsehoods either have been public or have otherwise become known to Axonics shows that the real volume of such false statements is very likely far greater. Medtronic representatives have met with individual doctors spreading their misinformation. It is customary in the medical device industry for sales representatives to meet on an individual and private basis with physicians who make purchasing decisions and it is common for such relationships to be long-standing and difficult to penetrate. It can be professionally costly for physicians to disclose information they are provided in such meetings even if the veracity of such information is suspect. There is a significant asymmetry therefore between the high ability to spread misinformation on the one hand and the curtailed ability to limit its harmful effects on the other. The examples of Medtronic email communications that Axonics is aware of (as described above) confirm that such communications are occurring.  It is unlikely that Axonics would be able to discover the full extent of conversations occurring in doctors' offices around the country. Indeed, even when Medtronic has publicly disseminated its false statements, Axonics has not, as a practical matter, despite great effort, been able to rebut such claims with every person receiving them.

62.     Even if Axonics knew the full extent of Medtronic's statements and had the complete information necessary to try to neutralize the harmful effects, such neutralization is not feasible because Medtronic's statements are so

threatening that a consumer is unlikely to invest the time and energy to try to assess whether the claims are true when the path of least resistance is to simply switch to another product. Once a person makes a claim that a medical device will result in otherwise avoidable surgery needing to be performed on the patient, the damage is done. Further, the appearance of neutral objectivity on the part of certain of those responsible for disseminating the false statements makes it even less likely that Axonics would be able to neutralize or offset the false or misleading statements.

63.    Axonics has spent substantial time, energy, and resources attempting to neutralize Medtronic's false statements. Given the longstanding and pervasive nature of Medtronic's campaign of misinformation, on information and belief, Axonics is not able to identify many such statements and is unable to effectively neutralize them both because of the inherently unfairly prejudicial nature of the assertions and because of the impossibility of keeping pace with Medtronic's network of employees and spokespeople's interactions with consumers.

64.    Medtronic's actions as detailed above were made with the specific intent to protect its longstanding monopoly in the SNM market against entry by Axonics and to establish monopoly in the SNM market by excluding Axonics. If Medtronic could succeed in persuading consumers that the use of Axonics' product is likely to result in the physical bodily harm of explant surgery, whether because of the purported recharge experience, because of purported battery damage, or any other false and misleading reason, then such a belief would more likely than not prevent Axonics from competing in the market. Medtronic has sought to achieve that very result through means that do not rely on a superior product or historical accident but a deliberate, carefully orchestrated, false, misleading, and illegal campaign of misinformation and deception that has not only targeted Axonics itself but the entire population of consumers who suffer from the pain of incontinence

and whom Medtronic seeks to deny the benefits of a competitive market for treatment.

## ANTITRUST CLAIMS
## INTERSTATE COMMERCE

65. The products at issue in Axonics' antitrust claims are sold in interstate commerce and Medtronic's unlawful activities alleged in these antitrust claims have occurred in, and have substantial effect upon, interstate commerce.

## NATURE OF THE CLAIMS

66. These antitrust claims that Axonics brings against Medtronic relate to Medtronic's illegal attempts to maintain or establish a monopoly in the market for sacral neuromodulation therapies for incontinence. Medtronic's conduct violates the antitrust laws as follows:

    a) Medtronic's acts constituting monopoly maintenance in the sacral neuromodulation ("SNM") product market in connection with Axonics' entry into that market violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

    b) Medtronic's attempts to monopolize the SNM product market through outright exclusion or anticompetitive attacks on Axonics violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

    c) Medtronic's conduct as alleged herein also constitutes unfair competition under § 17200 et seq. of the California Business and Professions Code.

67. Only injunctive relief can fully remedy the anticompetitive harm suffered both by Axonics and by the affected consumers. Medtronic must be enjoined to cease and desist all false, misleading, deceptive, threatening, and any other anticompetitive conduct that forms the basis of Medtronic's monopoly maintenance and attempted monopolization of the SNM product market at issue in the present case. Axonics also seeks damages for Medtronic's unlawful conduct.

Axonics is entitled to damages for the time, effort, and expense, including direct expenses and opportunity costs, involved in attempting to counteract Medtronic's anticompetitive conduct.  Axonics is further entitled to damages due to the lost sales and suppressed revenue and revenue growth that have been and continue to be caused by Medtronic's anticompetitive conduct.  These damages include lost profits and business opportunities as well as harm to reputation and forgone research and development opportunities.

## THE SNM PRODUCT MARKET

### A. SNM Products

68.     Approximately 20 million adults in the United States suffer from bowel or fecal incontinence, or accidental bowel leakage, which is a condition in which people get sudden urges to pass stool and experience leakage of stool before they can get to a restroom. These symptoms can significantly disrupt the daily activities of those suffering with them.

69.     Approximately 50 million people in the United States suffer from overactive bladder, which is a condition in which people have a frequent and urgent need to empty their bladders, and it can result in unintentional urine loss. These symptoms can also significantly disrupt the daily activities of those suffering with them.

70.     SNM is a therapy that can treat either or both bowel incontinence and overactive bladder. SNM provides gentle stimulation to the "sacral" nerves that communicate between the brain and the bladder and bowel. That stimulation helps restores normal communication between the brain and the bladder and bowel, which can result in symptom improvement.

71.     Today, commercial SNM systems are sold by only two manufacturers: Axonics and Medtronic. The systems for both companies include an implantable device and a "lead" that is placed near the sacral nerve and delivers electrical pulses through electrodes located near the end of the lead. The implant is placed in

25

a patient through a minimally invasive surgical procedure. The systems for both companies also include external remote control devices enabling the patient to control the treatment. Both Axonics and Medtronic provide rechargeable implants with external devices to charge the implants. Medtronic also offers a shorter-lived non-rechargeable SNM product, which, prior to Axonics' entry in the market, was the only option.

72.   Axonics is a pioneering innovator of sacral neuromodulation therapies that can restore normal control of the bladder and bowel to patients suffering from incontinence.   The Axonics Sacral Neuromodulation Therapy system (the "Axonics System"), comprising a rechargeable neurostimulator implant that delivers electrical stimulation directly to the sacral nerve, a recharge-free patient remote control, and a wireless charging system, has revolutionized the field of sacral neuromodulation for bladder and bowel control.

73.   Before Axonics launched its SNM products, the only widely available neurostimulation therapy option to treat patients with incontinence was Medtronic's InterStim product, a device with significant drawbacks for doctors and patients. Among other issues, InterStim lacked a rechargeable battery, so that the device both had a shorter useful life in patients—once the battery died, the device had to be explanted and replaced with a new implant. Additionally, patients with a Medtronic InterStim implanted could not safely have a full-body MRI exam; the device first had to be explanted from the body. If a patient wished to continue SNM therapy, they would need to undergo another surgical procedure to implant another device.

74.   The innovative Axonics System was a dramatic technological and usability advance over the legacy Medtronic product. Because the battery is rechargeable, it is substantially smaller than the Medtronic legacy product, and provides physicians more options for placement of the device. The rechargeable battery also increases the useful life of the device; it can provide therapy for at

26

least 15 years, in contrast to an average of 4.4 years for the Medtronic legacy product. The wireless charging system can be used by patients to charge the implant battery simply by holding it against the implant site. Moreover, the Axonics System provides patients with a small and intuitive remote control that is easy to understand and use. And the Axonics System was the first on the market to allow patients with a sacral neuromodulation implant to safely have a full-body MRI exam, without having to explant the device in advance.



**Small Neurostimulator Implant**
- Small, rechargeable implant to provide therapy for at least 15 years
- Placed through a minimally invasive outpatient procedure

**Remote Control**
- Recharge-free Remote Control that is small and easy to use
- Fits on a key chain so therapy can be discreetly managed
- Indicates when it is time to recharge

**Charging System**
- Wireless Charging System allows for mobility while charging
- Place charger over implant site for easy recharging
- A simple charging experience only needing to recharge once a month for an hour or less, at typical therapy settings.

https://www.axonics.com/patients/about-axonics-therapy/axonics-therapy.

75.     In response to the introduction of the Axonics System, and the positive response from doctors and patients, Medtronic took numerous steps to protect its market position. Among other things, Medtronic copied several of the innovative features of the Axonics System, including introducing a new sacral neuromodulation therapy device with a rechargeable battery and expanded MRI compatibility. Medtronic also orchestrated and carried out a campaign of making false statements about the Axonics System, including false and misleading statements about the safety and reliability of the Axonics System's rechargeable

battery and the prevalence and likelihood of patients needing to have the Axonics System explanted.

**B. No Suitable Substitutes For SNM For Treatment Of Bowel Incontinence**

76.     Treatment options for patients with bowel incontinence are limited. Initial treatments include, for example, diet changes, and exercises.

77.     If these initial treatments fail, doctors and patients may try an advanced therapy. Doctors and patients have only one minimally invasive treatment option that addresses communication between the brain and the bowel: SNM.

78.     On information and belief, other advanced therapies are not reasonable economic substitutes for SNM. For example, invasive surgeries, such as anal sphincter repair, carry their own unique risks as compared to the minimally invasive SNM treatment. Invasive surgeries also may not focus on the brain-bowel/bladder communication that may be causing symptoms, and instead focus on physical weaknesses of the anal sphincter. A hypothetical monopolist of SNM could profitably impose a small but significant and non-transitory increase in the price ("SSNIP") of SNM above the price in a competitive market.

79.     The initial treatments for bowel incontinence are not economic substitutes for SNM. While doctors and patients will typically try an initial treatment first, patients pursuing an advanced treatment are those for whom the initial treatments have failed. Advanced treatment patients and their treating doctors would not switch to one of the initial treatments (which failed) in response to a small but significant and non-transitory increase in the price of SNM.

**C. No Suitable Substitutes To SNM For Overactive Bladder**

80.     Treatment options for patients with overactive bladder are limited. Initial treatments include, for example, lifestyle changes (such as diet or pelvic floor exercises), bladder training, and medications.

81.     If these initial treatments fail, doctors and patients may try an advanced therapy. Doctors and patients have only one minimally invasive treatment option that addresses communication between the brain and the bowel and bladder: SNM.

82.     On information and belief, other advanced therapies are not reasonable economic substitutes for SNM. For example, Botox® injections carry their own risks, such as the potential for urinary retention, which requires self-catheterization and creates a risk of bladder infections. Botox also requires repeated procedures to receive injections. Unlike the implantable SNM system that improves brain-bowel/bladder communication, Botox inhibits the transmission of nerve signals. Thus, a hypothetical monopolist of SNM could profitably impose a SSNIP of SNM above the price in a competitive market. Patients and doctors would not switch from a SNM treatment to an invasive surgery in response. SNM and Botox have different prices, further confirming that they are not reasonable economic substitutes.

83.     On information and belief, another advanced therapy, for example, that may be alleged is the tibial nerve stimulation (PTNS), such as the Medtronic Nuro System, that provides percutaneous tibial neuromodulation. Unlike the implantable SNM system, PTNS is used in a treatment performed in a doctor's office weekly for the first 12 weeks (and then with increased time between treatments) in which a needle is inserted into a patient's leg and an external pulse generator is used to generate pulses. PTNS has not been shown to have similar efficacy to SNM. This treatment that requires ongoing doctor's office treatments is not a reasonable economic substitute for SNM. Thus, a hypothetical monopolist of SNM could profitably impose a SSNIP of SNM above the price in a competitive market. Patients and doctors would not switch from the implant-based SNM treatment to a repeated treatment in a doctor's office with PTNS. Instead, Medtronic says that this product is "an alternative for patients whose symptoms

have previously failed to respond to medications, but who are not a good candidate for sacral neuromodulation [] therapy," i.e., the products are aimed at different categories of patents. https://www.medtronic.com/us-en/healthcare-professionals/therapies-procedures/urology/percutaneous-tibial-neuromodulation/education-training/diagnosis-treatment.html. SNM and the PTNS have different prices, further confirming that they are not reasonable economic substitutes.

84.    The initial treatments for overactive bladder are not economic substitutes for SNM. While doctors and patients will typically try an initial treatment first, patients pursuing an advanced treatment are those for whom the initial treatments have failed. Advanced treatment patients and their treating doctors would not switch to one of the initial treatments (which failed) in response to a small but significant and non-transitory increase in the price of SNM.

**D. SNM Product Market**

85.    There is a market for SNM products. There are no economic substitutes for SNM for either bowel incontinence or overactive bladder. A hypothetical monopolist of SNM could profitably impose a SSNIP of SNM above the price in a competitive market. Patients and doctors would not switch from the SNM products to any other products.

86.    SNM products treat either bowel incontinence or overactive bladder in the same manner, and can treat both at the same time. These SNM products are all in the same market. Nevertheless, allegations pleaded herein are unchanged if there are separate markets for SNM when it is used to treat bowel incontinence, overactive bladder, or both. There is not an economic substitute for SNM whether it is being used for bowel incontinence, overactive bladder, or both.

87.    The market for SNM products is at least nationwide.

88.    Medtronic and Axonics both compete in the SNM market.

89.     On information and belief, Medtronic had a complete monopoly before Axonics entered the market and it has at all times since then had a market share of at least around 80% percent. On information and belief, Medtronic controls at least around 80% percent of the SNM market today. On information and belief, Axonics has approximately 20% market share while Medtronic has the remaining approximately 80%. On information and belief, Axonics is Medtronic's only other meaningful competitor in the SNM market. Prior to Axonics' entry into the market, Medtronic controlled 100% of the SNM market.

90.     There has been at every relevant time and there remains today a dangerous probability that Medtronic's anticompetitive conduct will result in a complete monopoly. Medtronic has market power and monopoly power. If Axonics is excluded from the SNM market as a result of Medtronic's illegal conduct, then based on Medtronic's and Axonics' current market shares, on information and belief, estimated to be around 20% for Axonics and around 80% for Medtronic respectively, Medtronic will have successfully completely monopolized the SNM market once again.

91.     Medtronic sought and continues to seek to exclude Axonics from the SNM market through anticompetitive and illegal means as alleged herein.

## MEDTRONIC'S MONOPOLY MAINTENANCE AND ATTEMPTED MONOPOLIZATION OF THE SNM MARKET

92.     Axonics hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 91 above.

93.     As alleged herein in the detailed allegations of the above-incorporated paragraphs, Medtronic has engaged in and continues to engage in exclusionary conduct that constitutes monopoly maintenance and/or attempted monopolization of the SNM market. Such conduct includes, without limitation, Medtronic's deliberate and systematic campaign of false and misleading information aimed at creating the false belief and the fear that use of Axonics devices will result in

otherwise avoidable explant surgeries. This campaign includes without limitation false and misleading statements regarding the recharge experience, false and misleading statements regarding battery overdischarge, false and misleading statements about explantation, and such other actions and statements as discovery will bring to light. Medtronic's actions also include inducing third parties with the cloak of neutral objectivity to spread Medtronic's false and misleading information. Medtronic's actions as alleged herein form part of a pattern, a course of conduct, and a scheme, that is anticompetitive, illegal, and aimed at protecting an existing monopoly and/or establishing monopoly power in the SNM market.

94.     In addition to the facts alleged above, on information and belief, Medtronic has taken additional actions that constitute part of its systematic, anticompetitive, and exclusionary course of conduct in the SNM market. On information and belief, such additional actions that form part of Medtronic's same overall anticompetitive scheme will become known through discovery in this matter.

## HARM TO COMPETITION

95.     Through its exclusionary conduct as alleged herein, and on information and belief additional like exclusionary conduct that will become known through discovery in this case, Medtronic has harmed competition, continues to harm competition, and threatens future harm to competition if its anticompetitive conduct is not enjoined.

96.     As alleged herein, Medtronic had a monopoly in the SNM market prior to Axonics' entry into that market. Since that time Medtronic's market share has at least remained around 80%.

97.     Medtronic's actions as alleged herein have been aimed at maintaining its high market share and reestablishing its complete monopoly through the deliberate and systematic dissemination of false and misleading information about Axonics' products.

32

98.     Medtronic's actions harm competition by threatening the ability of its only competitor to operate in the same market and help ensure that there is competition for technological advances, high quality products, and affordability to consumers of SNM products.

99.     Medtronic's actions have impaired consumers' ability to form truthful and accurate beliefs about competing products in the market and have thus facilitated Medtronic's maintenance of its high market share through misinformation and deception rather than through competition, higher quality, business acumen, or historical accident.

100.    Consumers in the SNM market suffered under Medtronic's monopoly for years. On information and belief, Medtronic maintained a higher market share and provided fewer technological benefits than would have been the case in the face of competition. On information and belief, Medtronic withheld existing technology from the SNM market that would have reduced the number of replacement surgeries its captive customers would have needed to suffer through. If Medtronic is allowed to exclude Axonics from the market the most plausible inference is that Medtronic's monopolistic pricing and suppression of new technology that would materially improve the lives of consumers in the SNM market will continue unabated.

101.    Moreover, Medtronic's actions have harmed competition by reducing the number of choices and slowing the availability of choices in the SNM market. Consumers inherently benefit when medical device companies are forced to compete. This is illustrated by the fact that when Axonics entered the market, Medtronic rushed to bring products with recharge capability and expanded MRI compatibility to market as quickly as it could after years of withholding those very technologies from the consumers who needed them.

102.    Medtronic's conduct also harms competition by threatening to eliminate a key benefit of that competition in the medical device space. As a

provider of medical implants, Medtronic is specifically aware of the ever-present and potentially devastating effects of product recalls. Indeed, if Medtronic successfully excludes Axonics from the SNM market this subjects consumers to the risk that if Medtronic's products are recalled, consumers will have no choice of SNM products at all. This risk is not academic or theoretical. Medtronic's rechargeable SNM product wireless recharger unit was already subject to a recall in late November 2021. *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?id=190094.

103.   Further, consumers have been harmed and are threatened with continued harm as a direct, proximate, and foreseeable result of Medtronic's exclusionary conduct. Medtronic's conduct has already harmed consumers who suffer from chronic urinary and/or fecal incontinence. Such consumers are faced with reduced availability of healthy competition in a market for products that can provide relief from incontinence. Consumers have also been harmed, on information and belief, by the false and misleading information that Medtronic has spread regarding Axonics' SNM products both because it has the potential to divert consumers from seeking help with the most suitable product, and because it has the potential to dissuade them from seeking help through SNM therapy at all, having undermined consumer confidence in the overall technology of sacral neuromodulation as a treatment for fecal and urinary incontinence. Consumers are also harmed by Axonics, the only material competitor with Medtronic in the SNM product market, having its resources diverted from research and development, physician education, and other efforts that benefit consumers suffering from incontinence, to attempting to counteract Medtronic's wrongful, unfair, and anticompetitive conduct as detailed above. But for Medtronic's illegal activities Axonics would have been even better able to aid consumers suffering from incontinence than it has already been. Moreover, consumers are threatened with severe harm if Medtronic is enabled to reinstate its complete monopoly in the SNM

34

product market including at least because it has already been shown historically that when Medtronic holds a complete monopoly in the SNM product market it suppresses technological advancement in the space, even to the extent of withholding from the market technology that Medtronic already has and could readily adapt to SNM, and competition in the SNM product market is the only thing preventing Medtronic from once again suppressing the advancement of key technologies in the market and once again depriving consumers of the many benefits that come from more than one company competing to provide the best SNM products to consumers who will benefit from them.

104.   Consumers in the SNM market have been and will be harmed by Medtronic's efforts to exclude competition. Medtronic's actions threaten higher prices, slower pace of innovation, reduction of quality and features of products, restriction of consumer choices, and increased risk that suitable products will not be available.

## ANTITRUST INJURY TO AXONICS

105.   Medtronic's anticompetitive conduct as alleged herein has directly harmed Axonics. The injury to Axonics flows from the anticompetitive nature of Medtronic's conduct and not from any legitimate or lawful competition by Medtronic.

106.   Axonics sells products in the SNM market where Medtronic has harmed, continues to harm, and threatens future harm to competition through the actions alleged above and other actions that on information and belief will become known through discovery in this matter.

107.   Medtronic's deliberate and systematic campaign of false and misleading statements about Axonics and its products is designed to instill in consumers the false belief that the use of Axonics' products will result in otherwise avoidable explant surgeries, such as due to the recharge experience or battery overdischarge.

108.   Axonics' antitrust injury as a direct and proximate cause of Medtronic's anticompetitive conduct as alleged herein includes but is not limited to actual and prospective harm to Axonics' reputation for providing safe and reliable medical implant devices, harm to Axonics' business due to reduced consumer confidence in SNM products provided by Axonics and SNM more generally, suppression of Axonics' entry into the SNM market, suppression of Axonics' revenue growth in the SNM product market and lost revenue in that market, diversion and suppression of Axonics' research and development efforts to attempt to combat the effects of Medtronic's exclusionary conduct on Axonics' business and reputation, and diverted company resources from other projects and opportunities, lost business opportunities,  as well as being excluded or being threatened with exclusion from the SNM product market.

109.   None of these injuries results from any alleged superiority of any Medtronic product, nor from any legitimate effect of Medtronic's pre-existing market position, reputation, business acumen, or other legitimate article of competition. Rather, these injuries flow directly from that which makes the conduct unlawful: Medtronic's deliberate and systematic campaign of false statements about Axonics and its products that were crafted for the purpose of excluding Axonics from the market and foreclosing competition in the SNM market, as well as the overall course of conduct and scheme that such statements are a part of. This is the type of injury that the antitrust laws were intended to prevent.

## COUNT I

### (Violation of Section 43 of the Lanham Act)

110.   Axonics repeats and realleges the allegations in paragraphs 1–109 as if fully set forth herein.

111.   Medtronic's statements concerning the Axonics System, examples of which have been described herein, are false and misleading.

112.   Medtronic's false and misleading statements have been made in commercial promotion and/or advertising of its own competing products.

113.   Medtronic's false and misleading statements misrepresent the nature, characteristics, and qualities of the Axonics System.

114.   Medtronic's false and misleading statements are likely to cause confusion as to the Axonics System, including its qualities, performance, technical characteristics, and suitability for patient use.

115.   Medtronic's false and misleading statements have deceived, and/or have the tendency to deceive, a substantial portion of the intended audience for these representations, including physicians, patients, and other actual or potential customers for Medtronic's and Axonics' products.

116.   Medtronic's false and misleading statements are material, in that they are calculated to, and likely to, influence purchasing decisions by actual and potential customers.

117.   Medtronic's products, including the products that compete with the Axonics System that are the subject of Medtronic's false and misleading representations, are provided for, and have traveled in, interstate commerce.

118.   Medtronic's false and misleading representations violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

119.   Medtronic has unfairly profited from its false and misleading representations.

120.   Axonics has been damaged by Medtronic's false and misleading representations.

121.   Medtronic's acts are willful, and Axonics is entitled to treble damages under 15 U.S.C. § 1117 and permanent injunctive relief under 15 U.S.C. § 1116.

122.   This is an exceptional case, and Axonics is eligible for an award of reasonable attorneys' fees under 15 U.S.C. § 1117.  Medtronic's acts in violation of the Lanham Act have caused, and, unless restrained and enjoined, will continue

to cause, irreparable injury and damage to Axonics for which there is no adequate remedy at law.

## COUNT II

### (FALSE ADVERTISING UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17500 ET SEQ.)

123.    Axonics repeats and realleges the allegations in paragraphs 1–122 as if fully set forth herein.

124.    Medtronic's statements concerning the Axonics System, examples of which have been described herein, are false and misleading.

125.    Medtronic's false and misleading statements have been made in commercial promotion and/or advertising of its own competing products.

126.    Medtronic knew, or by the exercise of reasonable care should have known, that its statements concerning the Axonics System were untrue or misleading.

127.    Medtronic's false and misleading statements have deceived, and/or have the tendency to deceive, a substantial portion of the intended audience for these representations, including physicians, patients, and other actual or potential customers for Medtronic's and Axonics' products.

128.    Axonics has been damaged by Medtronic's false and misleading representations.

129.    Medtronic's false and misleading representations constitute false advertising under California Business and Professions Code §§ 17500 et seq.

130.    Unless Medtronic is enjoined from further acts of false advertising, Axonics will continue to suffer economic harm as a result of Medtronic's ongoing conduct.

## COUNT III

### (Monopoly Maintenance of SNM Product Market in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

131.   Axonics hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 130 above.

132.   Medtronic possessed and possesses monopoly power in the SNM product market.

133.   Medtronic willfully acted and acts to maintain its monopoly power in the SNM product market, not as a consequence of its superior products, business acumen, or historic accident. Medtronic's anticompetitive and exclusionary conduct in the furtherance of its efforts to maintain its monopoly include at least the following and such other anticompetitive conduct as discovery in this matter will reveal: Medtronic has orchestrated a systematic campaign of false and misleading information concerning Axonics' products designed to deceive consumers into believing that using Axonics' products will result in otherwise avoidable explant surgeries. Further, Medtronic has caused third parties to present such false and misleading information in the cloak of objective neutrality and expertise. Medtronic took these actions for the purpose of maintaining or establishing monopoly in the SNM market not through competition but through harm to competition and with the specific aim of suppressing and excluding lawful competition. Medtronic's illegal scheme and systematic course of anticompetitive conduct included the false and misleading statements alleged herein but also Medtronic's pursuit of, for example, injunctive relief in copending Case No. 8:19-cv-02115-DOC-JDE, which is causally connected to Medtronic's false and misleading statements, which relate directly to the public interest inquiry for injunctive relief and whether Medtronic has come to equity with clean hands.

134.   As a direct and proximate result of Medtronic's conduct, Axonics has suffered irreparable harm including: actual and prospective harm to Axonics' reputation, harm to Axonics' business due to reduced consumer confidence in SNM products provided by Axonics and SNM more generally, suppression of Axonics' entry into the SNM market, suppression of Axonics' revenue growth in

the SNM product market and loss of revenue in that market, diversion and suppression of Axonics' research and development efforts and diverted company resources from other projects and opportunities, as well as being excluded or being threatened with exclusion from the SNM product market.

135.   Axonics and others will continue to suffer such irreparable harm absent appropriate injunctive relief.

136.   Axonics has also suffered monetary harm through its loss of business opportunities, diversion of business resources to attempting to neutralize Medtronic's anticompetitive acts, and flowing from and forming part but not all of the harm described above.

## COUNT IV

### (Attempted Monopolization of SNM Product Market in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

137.   Axonics hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 136 above.

138.   Medtronic has engaged in predatory or anticompetitive conduct, including at least the following and such other anticompetitive conduct as discovery in this matter will reveal: Medtronic has orchestrated a systematic campaign of false and misleading information concerning Axonics' products designed to deceive consumers into believing that using Axonics' products will result in otherwise avoidable explant surgeries, including for example due to recharge experience, or battery overdischarge. Further, Medtronic has caused third parties to present such false and misleading information in the cloak of objective neutrality and expertise. Medtronic took these actions for the purpose of maintaining or establishing monopoly in the SNM market not through competition but through harm to competition and with the specific aim of suppressing and excluding lawful competition. Medtronic's illegal scheme and systematic course of anticompetitive conduct included not only the false and misleading statements

alleged herein but also efforts to propagate the same such misstatements in the guise of objective neutrality of third parties, as well as such other actions that form a part of the same scheme that discovery will reveal.

139.   Medtronic had a specific intent to monopolize the SNM product market.

140.   Through its conduct, Medtronic has created a dangerous probability of achieving monopoly power in the SNM product market.

141.   As a direct and proximate result of Medtronic's conduct, Axonics has suffered irreparable harm including: actual and prospective harm to Axonics' reputation, harm to Axonics' business due to reduced consumer confidence in SNM products provided by Axonics and SNM more generally, suppression of Axonics' entry into the SNM market, suppression of Axonics' revenue growth in the SNM product market and lost revenue in that market, diversion and suppression of Axonics' research and development efforts and diverted company resources from other projects and opportunities, as well as being excluded or being threatened with exclusion from the SNM product market.

142.   Axonics and others will continue to suffer such irreparable harm absent appropriate injunctive relief.

143.   Axonics has also suffered monetary harm through its loss of business opportunities, diversion of business resources to attempting to neutralize Medtronic's anticompetitive acts, and flowing from and forming part but not all of the harm described above.

## COUNT V

**(Unfair Competition in Violation of California Business & Professions Code § 17200 et seq.)**

144.   Axonics hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 143 above.

145.   Medtronic has engaged in Unfair Competition under § 17200 et seq. of the California Business and Professions Code (UCL) by engaging in unlawful and unfair conduct. Medtronic's unlawful and unfair conduct has harmed competition in California and elsewhere and threatens significant harm to competition in the future. Medtronic's conduct is the direct and proximate cause of injury to California consumers and to Axonics.

146.   Medtronic has engaged in unlawful conduct in violation of the UCL, including based on the conduct alleged above that also violates Section 2 of the Sherman Act. Medtronic's unfair conduct threatens an incipient and continuing violation of the antitrust laws and also violates the policy and spirit underlying those laws because the effects of Medtronic's conduct are comparable to or the same as violations of those laws, or because Medtronic's conduct otherwise significantly harms competition. Medtronic's unfair competition includes multiple acts any one of which alone, and any combination of which, is sufficient to show a violation of the UCL including at least the following actions taken with the intent to and as part of an overall course of conduct and scheme whose purpose was to exclude competition from the SNM product market, to maintain or establish monopoly power in that market, and to significantly reduce competition in that market:

   a) A systematic and deliberate campaign of false and misleading information for the purpose of and with the intent to maintain its monopoly in the SNM product market, for the purpose of deceiving California consumers.

   b) A systematic and deliberate campaign of false and misleading information for the purpose of and with the intent to obtain a monopoly in the SNM product market, for the purpose of deceiving California consumers.

   c) Causing third parties to present such false and misleading information

in the cloak of objective neutrality and expertise, for the purpose of deceiving California consumers.

    d) Forcing Axonics to divert resources, time, and attention to attempting to neutralize Medtronic's above alleged conduct, wasting resources that Axonics would otherwise use to provide better products and services to consumers, including California consumers.

147. Medtronic's campaign of false and misleading statements about the Axonics System constitutes acts of unlawful, unfair, and fraudulent business conduct within the meaning of California Business and Professions Code §§ 17200 et seq.

148. These acts also constitute violations of the UCL (and antitrust laws and the Lanham Act) and as alleged herein and at the very least significantly threaten or harm competition in the SNM product market.

149. These acts have caused harm to competition in at least the ways alleged in the foregoing paragraphs.

150. Axonics has suffered harm as a direct, proximate, and foreseeable result of Medtronic's actions alleged herein. Such harm includes but is not limited to actual and prospective economic harm, harm to Axonics' reputation, harm to Axonics' business due to reduced consumer confidence in SNM products provided by Axonics and SNM more generally, suppression of Axonics' entry into the SNM market, suppression of Axonics' revenue growth in the SNM product market and lost revenue in that market, diversion and suppression of Axonics' research and development efforts and diverted company resources from other projects and opportunities, as well as being excluded or being threatened with exclusion from the SNM product market.

151. California consumers have been harmed and are threatened with continued harm as a direct, proximate, and foreseeable result of Medtronic's unlawful and unfair actions. Medtronic's unlawful and unfair conduct has already

harmed consumers in California who suffer from chronic urinary and/or fecal incontinence. Such consumers are faced with reduced availability of healthy competition in a highly consolidated market for technology that can provide relief from incontinence. California consumers have also been harmed, on information and belief, by the false and misleading information that Medtronic has spread regarding Axonics' SNM products both because it has the potential to divert consumers from seeking help with the most suitable product, and because it has the potential to dissuade them from seeking help through SNM therapy at all, having undermined consumer confidence in the overall technology of sacral neuromodulation as a treatment for fecal and urinary incontinence. California consumers are also harmed by Axonics, the only material competitor with Medtronic in the SNM product market, having its resources diverted from research and development, physician education, and other efforts that benefit California consumers suffering from incontinence, to attempting to counteract Medtronic's wrongful, unfair, and anticompetitive conduct as detailed above. But for Medtronic's illegal activities Axonics would have been even better able to aid California consumers suffering from incontinence than it has already been. Moreover, California consumers are threatened with severe harm if Medtronic is enabled to reinstate its complete monopoly in the SNM product market including at least because it has already been shown historically that when Medtronic holds a monopoly in the SNM product market it suppresses technological advancement in the space, even to the extent of withholding from the market technology that Medtronic already has and could readily adapt to SNM, and competition in the SNM product market is the only thing preventing Medtronic from once again suppressing the advancement of key technologies in the market and once again depriving consumers of the many benefits that come from more than one company competing to provide the best SNM products to consumers who will benefit from them.

152.   Axonics seeks an Order of this Court permanently enjoining Medtronic's unlawful and unfair business practices as alleged herein and any other relief the Court deems just and proper.

153.   Axonics and others will continue to suffer such irreparable harm absent appropriate injunctive relief.

154.   Unless Medtronic is enjoined from further acts of unfair competition, Axonics will continue to suffer economic harm as a result of Medtronic's ongoing conduct.

## **PRAYER FOR RELIEF**

Wherefore, Axonics prays for findings, relief, and judgment as follows:

A.   Judgment that Medtronic's false or misleading representations alleged above violate Section 43(a) of the Lanham Act;

B.   Award Axonics all of Medtronic's profits pursuant to § 1117(a)(1) of the Lanham Act;

C.   Award Axonics damages in an amount adequate to compensate Axonics for Medtronic's false and misleading representations pursuant to § 1117(a)(2) of the Lanham Act;

D.   Award Axonics pre-judgment and post-judgment interest to the fullest extent allowable by law;

E.   Treble Axonics' damages caused by Medtronic's violations of the Lanham Act pursuant to 15 U.S.C. § 1117;

F.   Enter an order finding this to be an exceptional case and awarding Axonics its reasonable attorneys' fees under 15 U.S.C. § 1117;

G.   Enter an order permanently enjoining Medtronic and its respective officers, directors, shareholders, agents, servants, employees, attorneys, all parent, subsidiary and affiliate corporations, their successors in interest and assignees, and all other entities and individuals acting in concert with or on behalf of Medtronic, from making false and misleading representations about Axonics' commercial

activities or business relationships in violation of the Lanham Act;

H.      Declare that Medtronic's conduct as alleged herein is anticompetitive and unlawful;

I.      Declare that Medtronic has unlawfully maintained its monopoly and attempted to monopolize the SNM market;

J.      Declare that Medtronic's anticompetitive conduct as alleged herein constitutes unfair competition under the UCL;

K.      Enter a permanent injunction requiring Medtronic to cease and desist all exclusionary conduct in the SNM market;

L.      Enter a permanent injunction requiring Medtronic to cease all activities constituting unfair competition under the UCL;

M.      Award Axonics damages (including lost profits) in an amount to be determined, trebled to the extent permitted by the antitrust laws;

N.      That Axonics be awarded their costs, disbursements (including expert fees), and reasonable attorney fees incurred in this action; and

O.      That Axonics be granted any other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Axonics demands a jury trial on all issues so triable.


Dated: February 25, 2022          Respectfully submitted,


                                  */s/  Matthew D. Powers*
                                  _____

                                  Matthew D. Powers (Bar No. 104795)
                                  William P. Nelson (Bar No. 196091)
                                  Gina Cremona (Bar No. 305392)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:   (650) 802-6000
Facsimile:    (650) 802-6001
matthew.powers@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
gina.cremona@tensegritylawgroup.com

Azra M. Hadzimehmedovic (Bar No. 239088)
Aaron M. Nathan (Bar No. 251316)
Samantha A. Jameson (Bar. No. 296411)
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102
Telephone:   (703) 940-5033
Facsimile:    (650) 802-6001
azra@tensegritylawgroup.com
aaron.nathan@tensegritylawgroup.com
samantha.jameson@tensegritylawgroup.com

Sterling A. Brennan
Christina L. Trinh
MASCHOFF BRENNAN
100 Spectrum Center Drive, Suite 1200
Irvine, CA 92618
SBrennan@mabr.com
CTrinh@mabr.com

*Attorneys for Plaintiff Axonics, Inc.*